In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 16-3585

ILLINOIS LIBERTY PAC,
Political Action Committee
registered with the
Illinois State Board of Elections,
EDGAR BACHRACH, and KYLE MCCARTER,

*Plaintiffs-Appellants*,

*v.*

LISA MADIGAN, Attorney General
of the State of Illinois, *et al.*,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 12-cv-5811 — **Gary Feinerman**, *Judge*.

---

ARGUED SEPTEMBER 27, 2017 — DECIDED SEPTEMBER 13, 2018

---

Before RIPPLE, SYKES, and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. Illinois Liberty PAC, Edgar Bachrach, and Kyle McCarter (collectively, "Liberty PAC") sued Illinois officials under 42 U.S.C. § 1983 alleging that certain cam-

paign contribution limits set by the Illinois Disclosure and Regulation of Campaign Contributions and Expenditures Act ("the Act"), 10 ILL. COMP. STAT. 5/9-1 *et seq.* (2016), violate the First Amendment. Invoking the intermediate-scrutiny framework of *Buckley v. Valeo*, 424 U.S. 1 (1976), Liberty PAC challenges four parts of the Act that it contends are not closely drawn to prevent quid pro quo corruption or its appearance. First, the Act sets lower contribution limits for individuals than for corporations, unions, and other associations. 10 ILL. COMP. STAT. 5/9-8.5(b)–(d). Second, the Act allows political parties to make unlimited contributions to candidates during a general election. *Id.* Third, a waiver provision lifts the contribution limits for all candidates in a race if one candidate's self-funding or support from independent expenditure groups exceeds $250,000 in a statewide race or $100,000 in any other election. *Id.* 5/9-8.5(h). And fourth, certain legislators may form "legislative caucus committees," which, like political party committees, are permitted to make unlimited contributions to candidates during a general election. *Id.* 5/9-1.8(c).

The district judge dismissed the first three claims at the pleadings stage, reasoning that Supreme Court precedent foreclosed them. The judge then held a bench trial to determine if the Act's more lenient regulation of legislative caucus committees—classifying them with political party committees—shows that the Act is not closely drawn to prevent quid pro quo corruption or its appearance. The judge ruled for the defendants, finding that legislative caucus committees are sufficiently similar to political party committees to justify their identical treatment under the Act.

We affirm across the board. The Supreme Court's campaign-finance cases plainly foreclose any argument that the Act's contribution limits for individual donors are too low or that the limits for other donors are too high. To overcome this impediment, Liberty PAC argues that the Act is fatally underinclusive by favoring certain classes of donors over others. But the Court has repeatedly upheld a similar federal campaign-finance scheme setting lower contribution limits for individuals than for other categories of donors, including political parties. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 187–88 (2003), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310, 319 (2010); *FEC v. Colo. Republican Federal Campaign Comm.*, 533 U.S. 431, 455–56 (2001); *Buckley*, 424 U.S. at 35–36. The Court has also said that a waiver provision like the one Illinois has adopted would not be unconstitutional. *See Davis v. FEC*, 554 U.S. 724, 737 (2008). Finally, on the record before us, we see no basis to disturb the judge's factual findings that legislative caucus committees are sufficiently akin to political party committees to justify Illinois's decision to treat them alike.

## I. Background

Illinois Liberty PAC is a political action committee that makes contributions to Illinois legislative candidates who support free-market principles. Bachrach, an individual donor, contributes to Illinois legislative candidates and political action committees. McCarter is an Illinois state senator. But for Illinois's regulatory regime governing contribution limits for elections to state offices, Liberty PAC and Bachrach would contribute more to candidates, Bachrach would contribute more to political action committees, and McCarter would solicit and accept larger contribu-

tions from donors. Together they filed this § 1983 lawsuit against Illinois Attorney General Lisa Madigan and members of the Illinois State Board of Elections to challenge certain of the Act's contribution limits.

The Act groups political donors into three broad categories: (1) individuals; (2) political committees; and (3) corporations, labor unions, and other associations. 10 ILL. COMP. STAT. 5/9-8.5(b). There are several types of political committees: political party committees, candidate political committees, political action committees, and legislative caucus committees. *Id.* 5/9-1.8(a). A political party committee is the state, county, or ward committee of a political party. *Id.* 5/9-1.8(c). Each candidate for public office may have one candidate political committee, which is composed of the candidate himself or the group that accepts contributions on his behalf. *Id.* 5/9-2(b). A political action committee or "PAC" is a group of people or an organizational association that accepts contributions, makes expenditures, and makes electioneering communications related to a political race exceeding $3,000 in a 12-month period. *Id.* 5/9-1.8(d). Finally, a legislative caucus committee is "established for the purpose of electing candidates to the General Assembly." *Id.* 5/9-1.8(c). A legislative caucus committee may be formed by the majority and minority leaders of the Senate and House, or by a group of five state senators or ten state representatives in the same partisan caucus. *Id.*

The Act sets different base contribution limits depending on the identity of the donor and recipient. An individual may contribute $5,000 to a single candidate in a given election cycle; $10,000 to a political action committee; and

$10,000 to a political party committee.[1] § 5/9-8.5(b)–(d). A corporation, labor union, or other association may contribute twice as much as an individual: $10,000 to candidates; $20,000 to political action committees; and $20,000 to political party committees. *Id.* A political action committee may contribute $50,000 to candidates, other political action committees, and party committees. *Id.* A political party committee may contribute up to $200,000 for a statewide candidate during a primary election and an unlimited amount during a general election. *Id.*

The Act has two additional features at issue in this case. First, if a candidate's self-funding or independent spending in support of the candidate exceeds $250,000 in a statewide race or $100,000 in any other election, then the contribution limits are waived for all candidates in that race. § 5/9-8.5(h). Second, as we've noted, the Act authorizes certain legislative leaders and groups of legislators to create legislative caucus committees. These are powerful political tools: legislative caucus committees are subject to the same generous contribution limits as political parties, but a candidate may not accept contributions from more than one legislative caucus committee in a given election cycle. § 5/9-8.5(b).

Liberty PAC's original complaint alleged that the Act violates the First Amendment because it is not closely drawn to prevent quid pro quo corruption or its appearance.[2] The

---

[1] The contribution limits have been adjusted upward for inflation since the Act was enacted. *See* 10 ILL. COMP. STAT. 5/9-8.5(g). We use the original figures throughout the opinion for simplicity's sake.

[2] McCarter was added as a plaintiff when Liberty PAC filed its amended complaint.

complaint challenged three aspects of the regulatory regime: (1) the provision setting higher contribution limits for corporations, unions, and other associations than for individuals; (2) the provision allowing political parties to make unlimited contributions to candidates in general elections; and (3) the waiver provision eliminating all contribution limits if one candidate's self-funding or independent spending in support of the candidate exceeds the thresholds mentioned above. The complaint also alleged that the Equal Protection Clause of the Fourteenth Amendment requires strict judicial scrutiny of classifications among donors. Soon after filing its complaint, Liberty PAC moved for a preliminary injunction.

In a comprehensive opinion, the judge denied the motion, reasoning that Liberty PAC was unlikely to succeed on any of its claims in light of adverse Supreme Court precedent. *Ill. Liberty PAC v. Madigan*, 902 F. Supp. 2d 1113 (N.D. Ill. 2012). Specifically, the judge explained that the Court has (1) routinely upheld similar gradations of contribution limits for different classes of donors; (2) implied that political parties *must* be treated more favorably than other groups given the unique relationship between parties and candidates; and (3) endorsed a materially similar waiver provision. *Id.* at 1118–25. The judge also ruled that Liberty PAC's argument for strict scrutiny under the Equal Protection Clause was unlikely to succeed because the Court consistently applies intermediate scrutiny to contribution limits. *Id.* at 1126. We summarily affirmed that order.

In an amended complaint, Liberty PAC reasserted its earlier claims and added a claim challenging the Act's treatment of legislative caucus committees. Liberty PAC alleged that the legislative caucus committees present an outsized

risk of quid pro quo corruption given their special fundrais-ing abilities and their leaders' roles in the policymaking process, yet the Act treats them more favorably than political action committees, other organizational associations (includ-ing corporations and unions), and individuals.

The defendants moved to dismiss the second complaint for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). The judge granted the motion with respect to Liberty PAC's original claims, incorporating the reasoning in his earlier order denying preliminary injunctive relief. The judge declined to dismiss the new claim pertaining to legislative caucus committees, giving the parties an opportunity to develop a more complete record. The parties filed cross-motions for summary judgment on that claim, but the judge denied both motions and held a bench trial.

Liberty PAC presented testimony from Dr. Marcus Osborn, who offered three reasons why legislative caucus committees should be classified as political action commit-tees rather than political party committees: (1) the structure of legislative caucus committees amplifies the risk of quid pro quo corruption; (2) legislative caucus committees use different strategies to fund candidates than political parties; and (3) legislative caucus committees are more susceptible to the influence of interest groups. The defendants presented limited testimony from an official at the State Board of Elections, who told the court that the Board has never made a negative audit finding against a legislative caucus commit-tee.

Following trial, the judge issued a Rule 52(a) order ex-plaining his findings of fact and conclusions of law and entering judgment for the defendants. The judge found

Dr. Osborn's opinion testimony unconvincing and rejected as implausible Liberty PAC's contention that legislative caucus committees "give legislative leaders materially *more* power over their respective caucuses." *Ill. Liberty PAC v. Madigan*, 212 F. Supp. 3d 753, 760 (N.D. Ill. 2016). He found that the substantial overlap between legislative caucus committees and the political parties to which they are linked was far more compelling: legislative leaders participate in party activities as well as caucus, committee, and other legislative work, and the parties and caucus committees share the same general goals. The judge concluded that any difference between legislative caucus committees and political parties does not materially affect the risk of quid pro quo corruption or its appearance, so Illinois's decision to treat them alike survived intermediate scrutiny.

## II. Discussion

Liberty PAC challenges the judge's rulings rejecting its four First Amendment claims.[3] Three of those claims come to us from a Rule 12(b)(6) dismissal; the remaining claim is before us on a Rule 52(a) order after a bench trial. We review a dismissal order de novo. *Tagami v. City of Chicago*, 875 F.3d 375, 377 (7th Cir. 2017). A claim to relief must be "plausible on its face" to survive a Rule 12(b)(6) motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We review the

---

[3] Liberty PAC did not appeal the dismissal of its equal-protection claim. It does, however, advance an argument that the First Amendment requires strict judicial scrutiny of contribution limits. This argument is foreclosed by *Buckley* and its successors. As we explain in the text, the Supreme Court has adopted a form of intermediate scrutiny for use in First Amendment challenges to contribution limits.

judge's factual findings following a bench trial for clear error and his conclusions of law de novo. *Winforge, Inc. v. Coachmen Indus.*, 691 F.3d 856, 868 (7th Cir. 2012). A finding is clearly erroneous if we are "left with the definite and firm conviction that a mistake has been committed." *Id.*

Most laws that burden political speech are subject to strict scrutiny. *Citizens United*, 558 U.S. at 340. For challenges to contribution limits, however, the Supreme Court has adopted a form of intermediate scrutiny: "Campaign contribution limits are generally permissible if the government can establish that they are 'closely drawn' to serve a 'sufficiently important interest.'" *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 152 (7th Cir. 2011) (quoting *Buckley*, 424 U.S. at 25). The prevention of "actual or apparent quid pro quo corruption is the *only* interest the Supreme Court has recognized as sufficient to justify campaign-finance restrictions." *Id.* at 153.

## A. Individual Contribution Limits

Illinois allows corporations, labor unions, and other associations to contribute $10,000 to candidates in a given election cycle but limits individual contributions to $5,000. Liberty PAC does not argue that these limits are unconstitutional when considered independently. The Supreme Court has routinely upheld similar base contribution limits as "serving the permissible objective of combatting corruption," *McCutcheon v. FEC*, 572 U.S. 185, 192–93 (2014), so long as those limits do not restrict too much political speech, *see Buckley*, 424 U.S. at 21. Using this framework, the Court has invalidated individual contribution limits ranging from $200 to $400 as too low, *Randall v. Sorrell*, 548 U.S. 230, 249–53 (2006) (plurality opinion), but upheld individual contribu-

tion limits at or just above $1,000, *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 395–97 (2000); *Buckley*, 424 U.S. at 21. Illinois's limits on contributions to candidates—$5,000 for individual donors and $10,000 for corporations, unions, and other associations—easily survive scrutiny under this precedent. Liberty PAC concedes as much.

Liberty PAC nonetheless contends that the contribution limits impermissibly discriminate against individual donors relative to corporations, unions, and other associations. It maintains that the defendants have the burden to show that "a contribution from an individual to a candidate that ranges from $5,001 to $10,000 presents an intolerable threat of corruption, while a contribution from a corporation, union, or association to a candidate in that same range does not." Relatedly, Liberty PAC complains that the judge wrongly dismissed this claim on the pleadings without putting the defendants to this evidentiary burden.

This cluster of arguments misunderstands the government's burden in a campaign-finance challenge like this one. The focus of the "closely drawn" inquiry in this context is whether the contribution limits for individual donors are above the "lower bound" at which "the constitutional risks to the democratic electoral process become too great." *Randall*, 548 U.S. at 248 (plurality opinion). As long as the challenged contribution caps exceed that lower boundary, the Supreme Court has "extended a measure of deference to the judgment of the legislative body that enacted the law." *Davis*, 554 U.S. at 737; *see also Randall*, 548 U.S. at 248 (plurality opinion) ("We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives."). That's because "a court has

no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." *Buckley*, 424 U.S. at 30 (quotation marks omitted).[4]

Liberty PAC's claim is better understood as a contention that the Act is fatally underinclusive. In other words, Liberty PAC essentially argues that Illinois's "failure to restrict other speech equally damaging to [its anticorruption interest] undercuts [its] position" that the limits on individual contributions are closely drawn to prevent corruption or its appearance. *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015). This is a difficult argument to make because "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Id.* (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). To state a cognizable First Amendment claim, Liberty PAC must do more than allege that a law restricts too little of *another person's* speech, *Davis*, 554 U.S. at 737, or that Illinois could have better served its anticorruption interest by adjusting certain contribution limits up or down, *see Williams-Yulee*, 135 S. Ct. at 1671 (rejecting the argument

---

[4] The Court has also deferred to legislative judgments setting contribution limits when the challenge proceeds under the Equal Protection Clause. *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 201 (1981) (stating that differing restrictions placed on different types of donors "reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the election process"); *McConnell v. FEC*, 540 U.S. 93, 188 (2003), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310, 319 (2010) (stating that "Congress is fully entitled to consider the real-world differences" between donor groups). As we've noted, Liberty PAC does not challenge the dismissal of its equal-protection claim.

that different campaign-solicitation restrictions would have better targeted the interest in avoiding corruption or its appearance). Liberty PAC must instead plausibly plead that Illinois was not *actually* concerned about corruption when it promulgated the individual contribution limits. It has not done so.

*Buckley* is instructive on this point. That iconic case resolved a broad-spectrum challenge to the Federal Election Campaign Act of 1971 ("FECA"). Relevant here is the Court's rejection of a challenge to a provision setting the contribution limit for political action committees five times higher ($5,000) than the limit for ad hoc organizations and individual donors ($1,000). 424 U.S. at 35–36. The Court brushed aside the contention that this difference in treatment undermined the regulatory aim of the limit on individual donors and ad hoc organizations, saying it was "without merit" because the higher limits for political action committees simply "enhance[d] the opportunity for bona fide groups to participate in the election process." *Id.*

Similarly here, Illinois could set higher limits for contributions from corporations, unions, and associations without fatally undermining the anticorruption interest served by the somewhat lower limits on contributions from individual donors. Indeed, the Court rejected a similar challenge in *Buckley* despite a much larger disparity between the limits on donor categories than is at issue here. Liberty PAC has not pointed to any case that would authorize us to invalidate Illinois's $5,000 contribution limit for individual donors merely because unions, corporations, and other associations can contribute twice that amount. In light of *Buckley*, and considering the limited nature of the underinclusiveness

inquiry and the utter lack of support for Liberty PAC's position, the judge correctly dismissed this claim on the pleadings.

## B. Political Party Committees

Liberty PAC next contends that the Act violates the First Amendment by exempting political parties from the limits on contributions to candidates in a general election. As before, Liberty PAC does not challenge the exemption standing alone. *See Davis*, 554 U.S. at 737 ("There is … no constitutional basis for attacking contribution limits on the ground that they are too high."). Again, Liberty PAC argues that treating political parties more favorably renders the limits on individuals and PACs fatally underinclusive.

Our analysis begins with *FEC v. Colorado Republican Federal Campaign Committee* ("*Colorado II*"), 533 U.S. 431 (2001). There the Court upheld federal limits on expenditures by political parties in coordination with their candidates, which were deemed to be the equivalent of contributions. *Id.* at 455–56. Applying the same intermediate-scrutiny test that applies to limits on contributions to candidates by individuals and nonparty organizations, the Court accepted the government's argument that the coordinated expenditure limits were closely drawn to serve the important interest of preventing "the risk of corruption (and its appearance) through circumvention of valid contribution limits." *Id.* at 456.

It does not follow from *Colorado II*, however, that the First Amendment forbids regulation that treats political parties more favorably when it comes to contribution limits, as Liberty PAC appears to argue. Indeed, the coordinated

expenditure limits at issue in *Colorado II*—ranging from $67,560 to $1,636,438 for U.S. Senate candidates, depending on state population—were vastly higher than the $1,000 limit on individual contributions to a candidate and the $5,000 limit on PACs. *Id.* at 439 n.3, 442 n.7.

And the four dissenters in *Colorado II* expressed their view that a political party's contributions to its candidates cannot be limited *at all*. *See id.* at 473–82 (Thomas, J., dissenting). The dissenters explained that "[t]he very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes." *Id.* at 476 (quotation marks omitted). That, the dissent said, "is the very essence of our Nation's party system of government." *Id.* at 477. So while it's possible to "speak of an individual citizen or a political action committee corrupting or coercing a candidate, … [w]hat could it mean for a party to 'corrupt' its candidate or to exercise 'coercive' influence over him?" *Id.* (internal quotation marks omitted).

Two years later in *McConnell v. FEC*, the Court rejected an argument that the Bipartisan Campaign Reform Act of 2002 ("BCRA") unconstitutionally discriminates against political parties as compared to special-interest groups like the National Rifle Association and American Civil Liberties Union. 540 U.S. 93, 187–88. The Court explained that Congress may set different rules for political parties than other groups:

> BCRA actually favors political parties in many ways. Most obviously, party committees are entitled to receive individual contributions that substantially exceed FECA's limits on contributions to nonparty political committees; indi-

viduals can give $25,000 to political party committees whereas they can give a maximum of $5,000 to nonparty political committees. *In addition, party committees are entitled in effect to contribute to candidates by making coordinated expenditures, and those expenditures may greatly exceed the contribution limits that apply to other donors.*

More importantly, however, *Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation.* Interest groups do not select slates of candidates for elections. Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses. Political parties have influence and power in the Legislature that vastly exceeds that of any interest group. As a result, it is hardly surprising that party affiliation is the primary way by which voters identify candidates, or that parties in turn have special access to and relationships with federal officeholders. *Congress'[s] efforts at campaign finance regulation may account for these salient differences.*

*Id.* at 188 (emphases added) (citations omitted).

*Colorado II* and *McConnell* establish the principle that campaign-finance laws may draw distinctions between political parties and other political donors—indeed, may substantially favor them in setting contribution limits—

without running afoul of the First Amendment. Accordingly, Illinois's choice to allow political parties to provide unlimited support to their candidates in a general election does not "raise[] a red flag" that the state is not *actually* concerned about corruption or its appearance elsewhere in the Act. *Williams-Yulee*, 135 S. Ct. at 1668.

## C. Waiver Provision

Liberty PAC next contends that the Act's waiver provision—lifting contribution limits for all candidates in a race if one candidate's self-funding or support from independent expenditure groups exceeds certain ceilings—fatally undermines Illinois's anticorruption rationale for the limits on individual and PAC donations. As Liberty PAC sees it, the waiver rule was designed to level the playing field, an impermissible justification for campaign-finance restrictions. *See generally Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 749–50 (2011) (rejecting equalization of resources as a compelling governmental interest). Liberty PAC also argues that the provision impermissibly favors incumbents. *See, e.g.*, *Randall*, 548 U.S. at 268 (Thomas, J., concurring) (reasoning that contribution limits that advantage incumbents may not be closely drawn to prevent corruption or its appearance).

The Court considered the constitutionality of a waiver provision in *Davis v. FEC*, 554 U.S. 724. At issue there was BCRA's "so-called Millionaire's Amendment," which increased the contribution limits for one candidate if his opponent's self-funding plus expenditures exceeded $350,000. *Id.* at 729. The Court held that the "asymmetric" waiver was unconstitutional because it "impose[d] an unprecedented penalty on any candidate who robustly

exercises" the First Amendment right to engage in political speech. *Id.* at 739.

Importantly, however, the Court reasoned that if the "elevated contribution limits applied across the board, [the self-funded candidate] would not have any basis for challenging those limits." *Id.* at 737. So "if [the Millionaire's Amendment] simply raised the contribution limits for all candidates," then a First Amendment challenge "would plainly fail." *Id.* As the Court explained: "[A] candidate who wishes to restrict an opponent's fundraising cannot argue that the Constitution demands that contributions be regulated more strictly." *Id.* Put somewhat more directly, there is "no constitutional basis for attacking contribution limits on the ground that they are too high." *Id.*

Though the Court was speaking hypothetically, this passage bears directly on Liberty PAC's challenge to the Illinois waiver provision, which lifts contribution limits "across the board"—that is, "for all candidates"—when one candidate's self-funding exceeds a certain threshold. As the Court's reasoning in *Davis* makes clear, a symmetrical waiver provision like this one survives constitutional scrutiny.

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, is also instructive. *Bennett* was a challenge to a state campaign-finance law that provided public funding to candidates who agreed to adopt certain self-funding and expenditure limits. *Id.* at 728–29. Those candidates also received matching funds if a privately financed opponent's expenditures exceeded a certain threshold. *Id.* The Court held that the matching-funds provision violated the First Amendment because it "impermissibly burden[s] (and thus reduc[es]) the speech of privately financed candidates and

independent expenditure groups." *Id.* at 741. Here, in contrast, Illinois's waiver provision does not restrict or tether the speech of some candidates to the spending of others. Each dollar spent by a candidate in excess of the spending threshold does not "generate[] … adversarial dollars in response." *Id.* at 738.

Finally, it's worth repeating that underinclusiveness claims occupy difficult theoretical terrain. *See Williams-Yulee*, 135 S. Ct. at 1668. When contribution limits are *equally* raised for all speakers, *no* speakers or viewpoints are favored or disfavored. The judge properly dismissed this claim.

## D. Legislative Caucus Committees

Finally, Liberty PAC challenges the judge's factual findings that legislative caucus committees are sufficiently similar to political party committees to justify their similar treatment under the Act. Liberty PAC argues that legislative caucus committees create unique opportunities for legislative leaders to engage in corruption.

Before proceeding, we note that Liberty PAC's challenge to the limits on legislative caucus committees essentially mirrors its attack on the exemption for political parties. As before, however, Illinois's decision to treat legislative caucus committees like political party committees cannot be challenged on the ground that the contribution limits are too high. *See Davis*, 554 U.S. at 737. So once again, Liberty PAC is left to argue that Illinois's more generous treatment of legislative caucus committees fatally undermines the anti-corruption rationale for its limits on contributions from PACs.

Taking his cue from *McConnell*'s discussion of the "real-world differences" between political parties and other interest groups, 540 U.S. at 188, the judge found that legislative caucus committees "are most akin to political parties" for purposes of campaign-finance regulation, *Ill. Liberty PAC*, 212 F. Supp. 3d at 767. The Supreme Court has said that congressional caucus committees—the federal analog to legislative caucus committees—are "identifiable as part of their respective party." *Id.* (quoting *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 40 n.20 (1981)). Legislative caucus committees align with their respective parties and have similar influence over their members, and in that sense are more closely analogous to party committees than to political action committees. Given the ties and structural similarities between legislative caucus committees and political parties, the judge found that Illinois's decision to treat them the same for purposes of contribution limits cast no doubt on the anticorruption justification for the limits on individuals, PACs, and other donors.

Liberty PAC maintains that the judge overlooked meaningful structural differences between the legislative caucus committees and political parties, the most significant of which is that legislative leaders have exclusive control over their legislative caucus committees, which allows them to use their committees to serve their own personal interests. A legislative leader may use his legislative caucus committee to consolidate power, maintain his position at the head of his caucus, and promote his personal policy agenda. Liberty PAC also points to Illinois's treatment of different types of legislator-to-legislator contributions. While the leader of a legislative caucus committee may make unlimited contributions during a general election (just like the political parties

to which they are tied), a candidate's committee may contribute a maximum of $50,000.

The judge rejected these arguments largely because a legislative leader's role in the statehouse is a de facto leadership position in the political party itself. The goal of the party and the legislative leader alike is to wield influence over the legislative policymaking process. We find no error in this reasoning.

Second, Liberty PAC asserts that the judge "lacked any basis" to reject Dr. Osborn's testimony because the defendants presented no evidence at trial to rebut his testimony. But the judge was not required to accept Dr. Osborn's opinions at face value. As the fact-finder, he was entitled to reject testimony that he found to be unpersuasive, even if its source was an expert witness. And the judge here reasonably rejected Dr. Osborn's testimony as insufficient to undermine Illinois's decision to treat legislative caucus committees as political party committees for purposes of setting contribution limits.

To start, Dr. Osborn testified that legislative leaders can use their control over their caucuses to wield influence over individual legislators, and the Act's exclusivity requirement—prohibiting a candidate from accepting contributions from more than one caucus committee—can make legislators beholden to their caucus leaders. The judge reasoned that these institutional controls do not make legislative caucus committees meaningfully different from the political parties with which they are aligned. And he viewed the exclusivity requirement as largely a red herring because candidates do not solicit or receive contributions from the other party's caucus.

Next, Dr. Osborn testified that legislative caucus commit-tees are more susceptible than political parties to outside influence because their donors are less diverse. For support he provided the donor profile for legislative caucus commit-tees and compared it with a *theoretical* donor profile for political parties. The judge rightly found the comparison between actual and theoretical data flawed. The data on actual donations to Illinois political parties is readily availa-ble, and Dr. Osborn's failure to use it in his comparison suggests that it would have undermined his theory.

Finally, Dr. Osborn testified that political parties typical-ly pursue an "expansion" strategy, deploying their contribu-tions to enhance the number of their officeholders. Political action committees, in contrast, pursue an "access" strategy to influence legislators' votes. *Ill. Liberty PAC*, 212 F. Supp. 3d at 761. Legislative caucus committees, he said, use access strategies because they contribute to candidates in primary races and to candidates who win the general election by wide margins. But as the judge recognized, these actions are equally consistent with an expansion strategy. Political parties sometimes take sides in primary races to assist candidates they deem more electable.

In short, the judge reasonably declined to accept Dr. Osborn's testimony and adequately explained his rea-sons for doing so. The clear-error standard for factual find-ings entered after a bench trial is "highly deferential." *Morisch v. United States*, 653 F.3d 522, 528 (7th Cir. 2011). "[I]f a factual finding is plausible in light of the record viewed in its entirety, we may not reverse that finding even if we would have decided the matter differently had we been the trier of fact." *Id.* (quotation marks omitted). The judge's

findings here easily surpass this deferential standard, and we have no warrant to substitute our own.

AFFIRMED.