In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 18-1998 & 18-2095

4SEMO.COM INCORPORATED,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

SOUTHERN ILLINOIS STORM SHELTERS, INC.,
INGOLDSBY EXCAVATING, INC., and BOB INGOLDSBY,

*Defendants-Appellants/*
*Cross-Appellees,*

*and*

ROMAN A. BASI and ALFRED E. SANDERS JR.,

*Intervenors/*
*Appellees.*

_____

Appeals from the United States District Court
for the Southern District of Illinois.
No. 3:13-cv-00297 DRH/SCW — **David R. Herndon**, *Judge.*

_____

ARGUED APRIL 1, 2019 — DECIDED OCTOBER 7, 2019

_____

Before EASTERBROOK, SYKES, and BRENNAN, *Circuit Judges*.

SYKES, *Circuit Judge*. This appeal involves a long-running trademark dispute over ownership and misuse of a word-mark and logo for below-ground storm shelters. The story begins in 2005 when a Missouri-based home-remodeling firm known as 4SEMO.com Inc. began selling storm shelters manufactured by Southern Illinois Storm Shelters, Inc. ("SISS"), an Illinois company run by Robert "Bob" Ingoldsby and his brother Scott. The dealership agreement gave 4SEMO the exclusive right to sell SISS shelters in portions of Missouri and Arkansas. As part of its marketing campaign, 4SEMO created a wordmark—"Life Saver Storm Shelters"— and a logo using that name, which it affixed to the shelters. In 2006 the Ingoldsbys asked 4SEMO for permission to use these marks on shelters marketed in southern Illinois. 4SEMO granted a limited license for that purpose, but the Ingoldsbys violated it by using the marks on products sold throughout the country.

SISS sued 4SEMO for trademark infringement, claiming prior use and ownership of the "Life Saver" wordmark. That claim did not survive summary judgment. 4SEMO counter-claimed for trademark infringement and false endorsement under the Lanham Act, along with several state-law claims. The counterclaims were tried to the bench, and the district judge found for 4SEMO across the board, entered a cease-and-desist order, and awarded more than $17 million in disgorged profits as damages. The judge denied 4SEMO's motion for vexatious-litigation sanctions under 28 U.S.C. § 1927 and attorney's fees under the Lanham Act.

On appeal SISS does not contest the judge's factual find-ings. It argues instead that 4SEMO's logo violates a statute

that makes it a crime to use the iconic emblem reserved to the American Red Cross: a red Greek cross on a white background. SISS also raises a novel legal argument to attack 4SEMO's ownership of the wordmark. Finally, SISS challenges the eight-figure monetary award. In a cross-appeal 4SEMO seeks review of the denial of § 1927 sanctions and Lanham Act attorney's fees.

We affirm for the most part. SISS's statutory argument is meritless and its legal theory challenging 4SEMO's ownership of the marks is new on appeal and thus is waived. We also reject the challenge to the damages award; the judge's conclusion that SISS engaged in trademark infringement on a vast scale is well supported by the evidence. Finally, although the judge reasonably concluded that § 1927 sanctions were not warranted, his summary denial of Lanham Act fees cannot be squared with his factual findings and legal conclusions on the merits of the infringement claim. Because those findings and conclusions satisfy the Act's standard for recovery of attorney's fees, we remand for the limited purpose of determining a reasonable fee award.

## I. Background

Ray Fielack is the president of 4SEMO, a home-remodeling company located in southeast Missouri. Bob and Scott Ingoldsby have been manufacturing storm shelters since 1998. They began operating under the SISS name in 2000 and continued to do so as Ingoldsby Excavating, Inc., since 2008.

In 2004 4SEMO purchased a storm shelter from an SISS dealer and installed it at the direction of a remodeling client. Pleased with the product, 4SEMO expressed interest in

buying more shelters from the dealer and began promoting them to potential customers. The dealer asked if 4SEMO would be interested in simply purchasing its existing inventory and becoming a dealer in its own right. 4SEMO agreed to do so.

Fielack decided that a set of identifiable trademarks would assist his company's foray into storm-shelter marketing and installation. In late March or early April 2005, he settled on the name "Life Saver Storm Shelters." He also designed a logo: a red Greek cross on a black background with the "Life Saver" product name written across its horizontal bar in yellow lettering. Fielack testified at trial that no one at 4SEMO had seen the name or logo before.

4SEMO took possession of the former dealer's inventory, stenciled its new logo and wordmark onto the shelters, and displayed them for sale. Starting in April or early May 2005, 4SEMO's brochures and signage, and the shelters it sold, featured the marks as shown below:



On May 5 4SEMO signed a formal dealership agreement with SISS. The contract granted 4SEMO exclusive retail rights in a territory that included portions of Missouri and Arkansas. It did not mention the marks. Around this time Scott Ingoldsby visited 4SEMO to exchange one of the inventory shelters for an updated model. He expressed no

familiarity with the marks. 4SEMO continued to market its inventory under the "Life Saver Storm Shelters" brand.

In February 2006 the Ingoldsbys asked 4SEMO for permission to use the "Life Saver Storm Shelters" marks in connection with retail sales and installations in southern Illinois. 4SEMO orally agreed to permit use of the marks in that region on three conditions: only shelters manufactured by the Ingoldsbys could be sold under the marks, the Ingoldsbys would install all branded shelters in a manner familiar to 4SEMO, and 4SEMO would maintain control over all promotional materials bearing the marks.

The Ingoldsbys did not comply with the license agreement. Doing business as SISS and later as Ingoldsby Excavating, they used the marks to promote a nationwide sales campaign, supplied other dealers with "Life Saver" branded shelters, and even registered the domain name "www.lifesaverstormshelters.com." The Ingoldsbys planned to continue this activity until 4SEMO discovered it, at which point they would try to buy the marks. And that's precisely what happened. In 2011 4SEMO discovered the widespread unauthorized use and demanded cessation. Scott Ingoldsby immediately offered to purchase the marks. The parties were headed toward an agreement until August 2012 when Bob Ingoldsby called off the deal. The Ingoldsbys later terminated the dealership agreement with 4SEMO and continued to use the marks even up to the month of trial.

In March 2013 SISS and Ingoldsby Excavating sued 4SEMO alleging trademark infringement in violation of the Lanham Act and several state-law claims. The suit was premised on a theory of retroactive ownership. The Ingoldsbys claimed that SISS and one of its licensed distribu-

tors sold shelters under the name "Life-Saver Storm Shelters" (with a hyphen) years before 4SEMO entered the picture. They characterized the 2006 license agreement as covering only the logo, not the wordmark.

4SEMO responded with multiple counterclaims against SISS, Ingoldsby Excavating, and Bob Ingoldsby (collectively "SISS" unless the context requires otherwise): trademark infringement and false endorsement under the Lanham Act, violation of the Illinois Uniform Deceptive Practices Act, breach of contract, unjust enrichment, and civil conspiracy. After several years of litigation, SISS acknowledged that most of its claims against 4SEMO lacked an adequate factual or legal basis. The judge dismissed most counts of the complaint and entered summary judgment for 4SEMO on the Lanham Act claims.

In late July 2017, the judge commenced a bench trial on the counterclaims with the case now reconfigured to show 4SEMO as the plaintiff. Fielack and the Ingoldsby brothers testified. 4SEMO presented a damages expert who testified that SISS's revenue from its decade-long nationwide sales of "Life Saver" branded shelters totaled approximately $17.4 million. SISS did not contest that calculation and waived its right to prove up offsetting costs.

Confronted with irreconcilable factual accounts, the judge sided with 4SEMO and entered findings of fact, conclusions of law, and a remedial award in its favor. The judge found that the Ingoldsbys were not credible witnesses. He found that 4SEMO owned both marks and SISS breached a valid license, generating consumer confusion and deception, and thus violated the Lanham Act, 15 U.S.C. § 1125(a). The judge also found for 4SEMO on the state-law claims.

Addressing damages, the judge found that the decade-long infringement was willful, intentional, egregious, even malicious. He awarded $17,371,003 in damages under 15 U.S.C. § 1117(a) and $26,940 for the breach of contract. He also ordered injunctive relief in the form of a cease-and-desist order. Finally, the judge held Bob Ingoldsby and his proprietorships jointly and severally liable for the judgment and denied 4SEMO's motions for attorney's fees under the Lanham Act and sanctions under 28 U.S.C. § 1927.

SISS appealed. 4SEMO filed a cross-appeal seeking review of the denial of attorney's fees and sanctions. Two of SISS's trial attorneys, Roman A. Basi and Alfred E. Sanders Jr., intervened as cross-appellees. After oral argument we issued an order noting a defect in the form of the order for injunctive relief under Rule 65 of the Federal Rules of Civil Procedure. We stayed the appeal pending entry of a proper injunction. The district court promptly entered an amended judgment, and the case is now ready for decision.

## II. Discussion

"We review the judge's factual findings following a bench trial for clear error and his conclusions of law de novo." *Ill. Liberty PAC v. Madigan*, 904 F.3d 463, 469 (7th Cir. 2018). SISS has not challenged the judge's factual findings, so we take them as established.

### A. The Red Cross Statute

SISS first argues that 4SEMO's logo is unlawful and thus unprotected by trademark law. This argument rests on a federal criminal statute reserving the emblem of a red Greek cross on a white background for the American Red Cross:

> Whoever wears or displays the sign of the Red Cross or any insignia colored in imitation thereof for the fraudulent purpose of inducing the belief that he is a member of or an agent for the American National Red Cross; or

> Whoever, whether a corporation, association or person, … *uses the emblem of the Greek red cross on a white ground, or any sign or insignia made or colored in imitation thereof* or the words "Red Cross" or "Geneva Cross" or any combination of these words—

> Shall be fined under this title or imprisoned not more than six months, or both.

18 U.S.C. § 706 (emphasis added).

This language is straightforward: only the American Red Cross may use the emblem of a red Greek cross on a white background or an insignia "made or colored in imitation thereof." *Id.* SISS contends that 4SEMO's logo clearly violates § 706,[1] noting that in 2012—while the parties were negotiating a sale of the marks—the Patent and Trademark Office rejected 4SEMO's application to register the logo on § 706 grounds. But the Trademark Office explained that 4SEMO could still secure registration if it "submit[ed] a substitute specimen … in a color other than red." 4SEMO promptly filed a replacement depicting a yellow cross with red lettering. Satisfied, the Trademark Office was prepared to register

---

[1] The judge considered and rejected this argument in a pretrial order, reasoning that § 706 only "prohibits someone from fraudulently trying to hold themselves out as an agent or a member of the American National Red Cross."

4SEMO's logo but stayed its proceedings pending the results of this litigation.

That history aside, the original version of 4SEMO's logo wasn't a red Greek cross on a white background, nor was it "made or colored in imitation" of the insignia reserved to the American Red Cross. *Id.* The Trademark Trial and Appeal Board has held that inclusion of additional design elements on or around a red Greek cross can make § 706 inapplicable. For example, in *In re Health Maintenance Organizations, Inc.*, 188 U.S.P.Q. (BNA) 473 (T.T.A.B. 1975), 1975 WL 20855, a trademark applicant submitted a dark Greek cross with a caduceus—the familiar medical symbol featuring two serpents entwined around a winged rod. The Appeal Board framed the inquiry as "whether [the] mark so resembles the Greek red cross that such mark can be said to consist of matter which may disparage or falsely suggest a connection with the" protected symbol. *Id.* at 473, at *1. On this understanding, the applicant's submission did not violate the statute, in part because "the representation of the caduceus … remove[d] any hint or suggestion of resemblance." *Id.*

The Appeal Board's logic is consistent with the statutory text, which prohibits logos "made or colored *in imitation*" of the familiar Red Cross insignia. We find the Board's analysis persuasive. The logo at the center of this dispute is a red Greek cross on a *black* background emblazoned with "Life Saver Storm Shelters" in large, yellow letters. The words fill nearly the entire horizontal bar of the cross, making it predominantly yellow. These different design elements provide what the caduceus provided in *Health Maintenance Organizations*: an obvious distinguishing feature from the traditional icon of the American Red Cross. 4SEMO's logo thus is not

"made or colored in imitation" of the Red Cross symbol, so § 706 does not bar 4SEMO's commercial use or negate the judge's finding of trademark infringement.

## B.  Ownership of the Wordmark

In the district court, SISS claimed to have marketed storm shelters under a virtually indistinguishable name—"Life-Saver Storm Shelters" (with a hyphen)—years before the relationship with 4SEMO. The judge rejected that prior-use theory, and his factual findings on that point are unchallenged on appeal.

Instead, SISS offers a new legal theory derived from observations in a widely cited trademark treatise. Discussing trademark disputes between manufacturers and their distributors, the *McCarthy* trademark treatise observes: "In the absence of an agreement defining ownership," there is a "rebuttable presumption that the manufacturer of [the] goods is the owner of the trademark of those goods." 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:48 (5th ed. 2018). The treatise goes on to describe a six-factor balancing test to determine whether the presumption has been rebutted. *Id.*

SISS argues that Professor McCarthy's factors weigh in its favor. This argument is new on appeal and thus is waived. *See, e.g.*, *In re Veluchamy*, 879 F.3d 808, 821 (7th Cir. 2018). Still, we note for completeness that Professor McCarthy's "test" might be relevant "where the *initial* allocation of trademark rights is in dispute." *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 n.4 (7th Cir. 1997). But where, as here, a party's initial ownership of a mark has been conclusively established as a factual matter,

the owner may "lose its rights by assignment or by abandonment, but not by some nebulous balancing test." *Id.*

Accordingly, the presumption and balancing test announced in the McCarthy treatise cannot displace the judge's unchallenged factual findings that 4SEMO created the marks, used them in commerce, and granted the Ingoldsbys a tightly limited license to use them. Indeed, if SISS already owned the wordmark, why would the Ingoldsbys have asked for a license to use it? Whatever force Professor McCarthy's balancing test may have in other cases, it has no effect here.

## C. Disgorged Profits

We turn now to a series of challenges to 4SEMO's $17.4 million judgment. SISS argues that the award constitutes a windfall for 4SEMO, imposes an inequitable penalty, and unlawfully contains profits earned in markets outside of 4SEMO's contractual dealership range.

Under the Lanham Act's damages provision, the district court may award a prevailing plaintiff "(1) [the] defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The statute installs a burden-shifting framework: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *Id.* 4SEMO took the first step. Its expert calculated approximately $17.4 million in revenue from unlicensed sales of "Life Saver" branded shelters. And before trial SISS affirmatively waived its right to prove up any deductions. Nor did SISS object to the expert's calculations or introduce countervailing evidence at trial.

These litigation decisions are fatal to SISS's appellate attacks on the damages award. Because SISS effectively conceded the expert's calculation at trial, its attack on the judgment as a windfall comes too late. SISS points to language in § 1117(a) saying that profits are awarded "subject to the principles of equity." *Id.* True enough, but a "trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985). Moreover, "[§] 1117 confers a great deal of discretion on a district court in fashioning a remedy for trademark infringement." *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 917 (Fed. Cir. 1984). The judge's decision to award the full $17.4 million without sua sponte reductions was not an abuse of discretion, especially given his finding that the infringement was "egregious."

SISS also argues that the judge should have excluded profits earned in geographic areas beyond 4SEMO's dealership territory. In other words, because 4SEMO could not sell SISS's shelters outside of specified counties in Missouri and Arkansas, its trademark rights were also confined to those counties. This argument too was not raised below and thus is waived. It's also meritless. The dealership agreement did not impose geographic restrictions on 4SEMO's trademark rights. The agreement gave 4SEMO the exclusive right to resell SISS products within the identified territory, but it placed no limits on 4SEMO's right to sell other products—including storm shelters manufactured by other companies—anywhere in the United States.

Next, SISS seeks refuge in the *Tea Rose–Rectanus* defense, a common-law trademark doctrine that stems from a pair of

century-old Supreme Court cases. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918). It provides that a "senior user of an unregistered mark cannot stop the use of a territorially 'remote' good faith … junior user who was first to use the mark in that territory." 5 MCCARTHY, *supra*, § 26:2. We've referred to this rule as the "good faith junior user" defense. *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 674 (7th Cir. 1982).

This argument rests on the same flawed view of the dealership agreement, which we've already addressed. Regardless, the Ingoldsbys clearly did not act in good faith when they appropriated 4SEMO's marks. As we explained in *Money Store*, "[a] good faith junior user is one who begins using a mark with no knowledge that someone else is already using it." *Id.*; *see also Hanover Star*, 240 U.S. at 412 (explaining that the junior user adopted the mark "in perfect good faith, with no knowledge that anybody else was using or had used those words"). The defense shields those who unwittingly develop a mark that duplicates another, not intentional counterfeiters.

The next attack on the damages award focuses not on the judgment's size or legal basis but on who must pay it. The judge held SISS, Ingoldsby Excavating, and Bob Ingoldsby jointly and severally liable for the judgment. Bob Ingoldsby challenges the judge's decision to hold him personally liable, characterizing his brother Scott as the moving force behind any trademark infringement.

A corporate officer is individually liable if he "personally participates in the manufacture or sale of the infringing article … , uses the corporation as an instrument to carry out

his own willful and deliberate infringements, or … knowing-ly uses an irresponsible corporation with the purpose of avoiding personal liability." *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926). The judge's unrebutted factual findings defeat this argument. He found no evidence that the Ingoldsbys respected the corporate form of either SISS or Ingoldsby Excavating: "The record is devoid of any corporate formation documents, articles of incorporation, bylaws, operating agreements, board resolutions, or any other evidence of corporate activity in general … ." These businesses were proprietorships, not truly independent corporate entities.

Moreover, Bob Ingoldsby's attempt to shift blame to his brother doesn't stand up to scrutiny. That 4SEMO typically interacted with SISS and Ingoldsby Excavating through Scott does not undermine the judge's well-founded conclusion that Bob maintained full operational control. And while Bob occasionally claimed ignorance at trial, the judge specifically "found the Ingoldsbys' claimed inability to recall important details of, or claimed non-involvement with, certain matters" to be "suspect." Even if Bob *could* inculpate his brother, he faces another problem: the judge concluded that the Ingoldsbys were each other's agents as well as participants in a civil conspiracy. Any act or omission by Scott must be imputed to Bob, so the latter's fraternal finger-pointing is ultimately pointless.

## D.  Sanctions and Fees

4SEMO's cross-appeal challenges the judge's refusal to award attorney's fees under the Lanham Act's fee-shifting provision or sanctions under 28 U.S.C. § 1927. We take the latter argument first. Under § 1927, "[a]ny attorney … who

so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 4SEMO's sanctions claim is directed at intervenors Basi and Sanders. We review for abuse of discretion. *Fox Valley Const. Workers Fringe Benefit Funds v. Pride of Fox Masonry & Expert Restorations*, 140 F.3d 661, 666 (7th Cir. 1998).

Vexatious-litigation sanctions under § 1927 require a showing of either subjective or objective bad faith. *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006). 4SEMO focuses on the latter. Objective bad faith consists of reckless indifference to the law: "pursu[ing] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005) (quotation marks omitted). 4SEMO insists that Basi and Sanders engaged in vexatious behavior and made objectively unreasonable legal arguments. The district court disagreed. Though he ruled summarily, we see no abuse of discretion. Basi and Sanders were entitled to zealously represent their clients, and although SISS's claims were meritless, we're hard-pressed to find reckless indifference.

The claim for attorney's fees is another story. The Lanham Act permits district courts "in exceptional cases" to "award reasonable attorney fees to the prevailing party." § 1117(a). Interpreting identical language in the Patent Act, the Supreme Court held "that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position … or the unreasonable manner in which the case was litigated." *Octane*

*Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). Again we review for abuse of discretion. *Fin. Inv. Co. (Berm.) v. Geberit AG*, 165 F.3d 526, 530 (7th Cir. 1998).

Based on our reading of the judge's findings and conclusions, this was an exceptional case. The judge found that the Ingoldsbys engaged in a vast infringement campaign and indeed planned in advance to offer to buy the marks only "if and when 4SEMO discovered the[ir] improper use and complained." He found their conduct "willful, egregious[,] and intentional." Likewise, he found that they "acted in bad faith, intentionally, willfully[,] and maliciously[;] [and] have refused to cease the infringing activity[] and … caused 4SEMO unnecessary trouble and expense." Then, in the next sentence, the judge summarily denied 4SEMO's motion for Lanham Act attorney's fees. Respectfully, that conclusion simply doesn't follow from the factual findings of willfulness, maliciousness, and bad faith.

We therefore REVERSE the denial of attorney's fees and REMAND for entry of a reasonable fee award under § 1117(a). In all other respects, the judgment below is AFFIRMED.